**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **JAMES PACE,**                   ) | |
|                           ) | |
|        **Plaintiff,**      ) | |
|                          ) | |
| **vs.**                        ) | **CIVIL ACTION NO 05-152-KD-C** |
|                          ) | |
| **LIBERTY LIFE ASSURANCE**   ) | |
| **OF BOSTON, a corporation,**    ) | |
|                          ) | |
|       **Defendant.**      ) | |

**MEMORANDUM OPINION AND ORDER**

This action was removed to this court pursuant to the Employee Retirement Income Security Act of 1974, (ERISA), 29 U.S.C. § 1001, et seq., and is now before the court on the motion for summary judgment filed by defendant  Liberty Life Assurance Company of Boston (Doc. 29), plaintiff's response in opposition to motion for summary judgment with supporting brief (Doc. 34), and defendant's reply (Doc. 35).  Upon consideration of all matters presented, as set forth in detail below, and after review of the record in a light most favorable to the plaintiff, the Court determines that defendant is entitled to judgment as a matter of law as to all of the claims alleged against it in plaintiff's complaint.

**I.**     **Procedural History**

Plaintiff filed this action on or about February 7, 2005 in the Circuit Court of Monroe County, Alabama. (Doc. 1)  Defendant removed the case to this court by a notice of removal filed March 11, 2005 on the basis of diversity jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1141, and federal question jurisdiction, pursuant to 28 U.S.C. §§ 1331 and 1141, arising under ERISA. (Doc. 1)   Defendant also filed a motion to dismiss the complaint alleging that the state law claims

asserted therein were preempted by ERISA. (Docs. 4, 5)

Plaintiff did not move to remand but instead filed an amended complaint asserting only a claim for benefits under 29 U.S.C. § 1132(a)(1)(b) of ERISA (Doc. 13)[1] and a response to the motion to dismiss. (Doc. 12)   Plaintiff's amended complaint alleges that defendant wrongfully denied plaintiff's claim for long term disability benefits pursuant to a group disability income policy issued by defendant to plaintiff's employer. (Doc. 12, ¶ 6).  Plaintiff claims disability as the result of a psychiatric impairment which would entitle him to benefits under the plan for a period of twenty-four (24) months at a monthly indemnity rate of approximately $1,800.00 per month.[2]  (Doc. 34).  On March 31, 2005, this court entered an order finding as moot the motion to dismiss (Doc. 14) and on April 6, 2005, defendant filed its answer to the complaint wherein defendant denies that it wrongfully denied plaintiff's claim. (Doc. 15).

## FINDINGS OF FACT

1. Plaintiff was employed as a maintenance mechanic for approximately 25 years at a facility owned by Alabama River Pulp Company. (Doc. 29).  The job required plaintiff to maintain equipment and have the ability to "read 'prints on equipment', perform high school level mathematics, operate cranes and hydraulic lifts, [and] perform skilled craft work as a millwright, machinist, and pipefitter". (Doc. 29, p. 6).

---

[1] ERISA and the Secretary of Labor's regulations under the Act require "full and fair" assessment of claims and clear communication to the claimant of the "specific reasons" for benefit denials. 29 U.S.C. § 1133; 29 C.F.R. § 2560.5031.  Section 1132 provides, in pertinent part, that a civil action may be brought "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. 1132(a)(1)(B).

[2] Plaintiff has been awarded Social Security disability benefits the amount of which would be deducted from the monthly benefit amount payable under the plan. (Doc. 34).

2.  Defendant provides disability coverage to the employees of Alabama River Pulp Company, determines whether claimants meet the policy eligibility requirements, and pays the approved claims. (Doc. 32, Exhibit A, at Bates Stamp No. 000002).  The policy provides for benefits under two definitions of disability: "own occupation" disability and "any occupation" disability.[3] (Doc. 32, Exhibit A at 000007).  The scope of benefit is determined by the "Class" to which an employee belongs.  The policy identifies three classes: Class 1, consisting of company executives, Class 2, consisting of employees of Alabama River Newsprint (an affiliated company), and Class 3, consisting of all other employees. (Doc. 32, Exhibit A at  000004). Plaintiff belongs to Class 3 and as such he is subject to a twenty-four month maximum "own occupation" benefit period. (Doc. 32, Exhibit A at 000005, at 000048, 000184, 000240).

3.  In the policy, "disability" or "disabled" for a person subject to the 24 month "own occupation" benefit, "means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation...." (Doc. 32, Exhibit A at 000007).

4.  In the policy, mental illness is defined as "a psychiatric or psychological condition classified as such in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) regardless of the underlying cause of the Mental Illness." (Doc. 32, Exhibit A at 000009).

5.  In the policy,

"Proof" means the evidence in support of a claim for benefits and includes, but is not limited to, the following:

---

[3]  Because plaintiff's claim was denied under the "own occupation" disability definition, the "any occupation" definition is not relevant.

      1.  a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;

      2. an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and

      3. the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays, and/or other forms of objective medical evidence in support of a claim for benefits.

Proof must be submitted in a form or format satisfactory to Liberty.

(Doc. 32, Exhibit A at 000009).

      6.  In addition to setting time frames for providing proof, the policy also states that "Liberty reserves the right to determine if the Covered Person's Proof of loss is satisfactory." (Doc. 32, Exhibit A at 000031).

      7.  The policy contains an "Elimination Period" of 180 days which is defined as "a period of consecutive days of Disability or Partial Disability for which no benefit is payable" and "begins on the first day of Disability." (Doc. 32, Exhibit A at 000005, 000008).

      8.  The policy provides that the "benefit for Disability due to Mental Illness, Substance Abuse and/or Non-Verifiable Symptoms, will not exceed a combined period of 24 months of Monthly Benefit payments[.]" (Doc. 32, Exhibit A at 000017).

      9.  Section 7 of the policy, entitled "General Provisions", states as follows:

      Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder.

(Doc. 32, Exhibit A at 000030).

      10.  Plaintiff last worked on January 6, 2004 and his claim for disability was received on May 21, 2004. (Doc. 32, Exhibit A at 000183-185).  His six month period elimination began on

January 7, 2004 and ended on July 4, 2004. (Doc. 32, Exhibit A at 000181).

 11.  In the disability claim form dated May 5, 2004, for date injury or illness began, plaintiff wrote "see doctor's notes". (Doc. 32, Exhibit A at 000185).  With this form, plaintiff submitted an undated Attending Physician's Statement signed by Arthur DuMont, M.D., plaintiff's psychiatrist, wherein Dr. DuMont diagnosed major depression, panic disorder, and status post coronary artery bypass graft 1988. (Doc. 32, Exhibit A at 000186).  Dr. DuMont reported that plaintiff's first visit was March 31, 2004 and his most recent was May 5, 2004. (Doc. 32, Exhibit A at 000186).  For the question entitled "date symptoms first appeared / accident occurred", Dr. Dumont answered 1-2-2004. (Doc. 32, Exhibit A at 000186).  He did not rate plaintiff's degree of physical impairment but instead wrote  "N/A".  (Doc. 32, Exhibit A at 000187).  Dr. DuMont rated plaintiff's "Mental/Nervous Impairment" as Class 5, the highest available rating described as follows: "Patient has significant loss of psychological, physiological, personal, and social adjustment (severe limitations)." (Doc. 32, Exhibit A at 00187).  He also noted "s/p coronary artery bypass graft 1988" as a concurrent condition and as to cardiac impairment wrote "per cardiologists" (Doc. 32, Exhibit A at 00186-187).

 12.  Dr. Dumont provided a one page treatment record with the attending physician's statement which indicates he initially saw plaintiff on March 31, 2004. (Doc. 32, Exhibit A at 000188).  The treatment record included a medication list from March 31, 2004 which indicated plaintiff was taking four medications, including Zoloft, an anti-depressant. (Doc. 32, Exhibit A at 000188).  Although not provided with the attending physician's statement, Dr. DuMont later provided the treatment notes from his initial consult on March 31, 2004, wherein he noted as follows:

> Referred for eval by Dr. Stallworth of Monroeville for eval of depression &
> anxiety. He was medically retired from the mill where he worked for 25 yrs in
> maintenance.  Had CABG [coronary artery bypass graft] 16 yr ago & cont to be
> followed regularly.  Had by description a panic attack in 1998 when he pulled off
> the road & found in confused state.  Had neg med eval & was started on Zoloft
> with good benefit but symptoms returned every time he got off of it. Even on it he
> remained anxious, fearful, intolerant of others, confused, shaky, tremulous with
> problems retaining or learning new information. Can't remember names. Spouse
> has to handle all bills, etc. Advise appeal Soc Sec Denial as pt not capable of
> employment.

(Doc. 32, Exhibit A at 000097).  On mental status examination, Dr. Dumont noted plaintiff was

"alert/ O x 4", grooming is "good", mood "anxious", affect "slightly labile,"spontaneity "fair",

psychomotor activity [normal], speech "fluent", thought processes "cogent",  hallucinations/

delusion and suicidal ideations "none", judgment "good", and insight "good". (Doc. 32, Exhibit A

at 000097).  His treatment plan consisted of "supportive sessions", increasing plaintiff's Zoloft

from 50 mg to 75 mg per day and to follow up in four weeks. (Doc. 32, Exhibit A at 000097).

13.   The treatment record also shows that on May 5, 2004, the day that Dr. DuMont

completed the attending physician's statement, plaintiff reported to Dr. Dumont that he had an

> anxiety/panic attack on Sunday after a disagreement with his sister.  Felt like he
> was choking with tightness in neck.  Rested poorly that night. Spouse thinks better
> but still has moderate mood dysphoria & cognitive impairment.  Has a garden he
> enjoys working in.  Also enjoyed some bream fishing. Can not tolerate stress.
> Memory poor.  Misplaces & loses things. Spouse cont. to have to handle all
> business & bills.

(Doc. 32, Exhibit A, at 000096).  Dr. DuMont also noted "Supportive therapy session.  Not

suicidal.  I cont. to advise proceeding with Disability Appeal.  He is not capable of working. F/U

4 wks." (Doc. 32, Exhibit A, at 000096).  Dr. DuMont increased plaintiff's Zoloft dose to 100 mg

and a gave him samples of Klonopin. (Doc. 32, Exhibit A, at 000096).

14.  Dr. DuMont later provided records of plaintiff's June 1, 2004 visit, wherein Dr.

-6-

Dumont noted that plaintiff was

> displaying a [positive] response to medication regimen.  Avoiding stress wherever
> possible.  Sleep improved.  Appetite fair.  Still poor memory & can not handle
> bills.  Pleasant & cooperative in session.  Continues unable to return to any type
> employment.  Cont[inue] current meds. F/U in 8 wks.

(Doc. 32, Exhibit A, at 000096).  He also provided records from plaintiff's last reported visit on

July 28, 2004, wherein Dr. DuMont noted plaintiff

> continues to have a positive response to treatment to help contain the more overt
> symptoms of anxiety & depression with no full blown panic attacks as he avoids
> any stressful situation. Planted small garden he enjoyed tending.  His problems
> with cognition continue severe with spouse continuing to have to handle all bills,
> etc.  His speech is slowed & affect somewhat blunted.  He remains pleasant &
> cooperative. Will plan to continue medications. . . .  He continues incapable of any
> functional vocational employment now or for the foreseeable future.

(Doc. 32, Exhibit A, at 000095).

15. On May 11, 2004, plaintiff also submitted an attending physician's statement from

James Stallworth, M.D., his primary physician at Doctors Clinic, PC.  Dr. Stallworth noted

plaintiff's diagnoses were "chronic anxiety and depression since 1998" and that his date of first

treatment was February 20, 1998 and his last visit was May 11, 2004. (Doc. 32, Exhibit A at

000195).  Dr. Stallworth attached a copy of his treatment notes from plaintiff's most recent visit

on May 11, 2004 wherein he noted plaintiff "recently saw Dr. Dumont regarding anxiety and

depression. Continues on Zoloft" and that plaintiff "recently saw Dr. Phillips, his cardiologist.

Had a stress test, followed by cardiac catheterization.  See reports on chart." (Doc. 32, Exhibit A

at 000196).  On examination, Dr. Stallworth made no notation regarding plaintiff's mental status

and reported no abnormalities on physical examination. [4]

---

[4] Dr. Stallworth's records include the notes made by other treating physicians at Doctors
Clinic P.C. in Monroeville, Alabama.  The earliest treatment notes provided are from March 6,

16.   The medical records during 2003, preceding plaintiff's date of disability, January 2, 2004, indicate that plaintiff was seen by Timothy Jones, M.D., an associate of Dr. Stallworth, on April 29, 2003 and reported that he "has been doing well subjectively. Denies any new problems. Handling the stress of his work well." (Id. at 000210).  Dr. Jones did not report any cognitive impairment and did not include depression or anxiety among plaintiff's diagnoses.  Plaintiff returned on June 6, 2003 and Dr. Jones noted "patient is doing well subjectively" and that plaintiff should continue diet, exercise, weight reduction, medications.  Recheck in six months" (Id. at 000210).  Dr. Jones did not report any cognitive impairment and did not include depression or anxiety among plaintiff's diagnoses. (Id. at 000210).  On August 5, 2003, plaintiff saw Dr. Jones for a urinary tract infection and bursitis of the left foot.  Dr. Jones did not report any cognitive impairment and did not include depression or anxiety among plaintiff's diagnoses. (Id.

_____

2002.  J. Timothy Jones, M.D., noted plaintiff was "doing well subjectively.  He said he got off his nerve meds and is doing well."  (Doc. 32, Exhibit A at 000214).  It appears plaintiff was treated primarily for a respiratory infection but also followed routinely for high blood pressure, high blood sugar, high cholesterol, obesity, and status post cardiac bypass surgery.  Cognitive impairment or memory loss is not documented.  Plaintiff returned on June 7, 2002 and reported dizziness, lightheadness, elevated blood pressure and some work stress to Dr. Stallworth.  He was advised to rest at home that day. (Id. at 000213).  On June 10, 2002, Dr. Stallworth noted plaintiff tapered off his anti-depressant Zoloft but "didn't do particularly well", waking at 3:00 am.  Plaintiff reported stress at work and that "his wife started him back on Zoloft".  (Id. at 000213).  He also reported that he was feeling better and his blood pressure was down.  Anxiety and depression were diagnosed and plaintiff was advised to continue Zoloft and go on two weeks of light duty. (Id. at 000213).  There was no mention of cognitive impairment. On June 27, 2002, plaintiff returned and saw Dr. Jones who noted "intermittent memory  impairment/confusion". (Id. at 000212).  Dr. Jones noted a consult with another physician who reported plaintiff had a similar episode in 1998 and "saw a psychologist/psychiatrist at that time, who felt that stress was the primary problem and Zoloft seemed to be effective in relieving that.  The patient is much improved since he got back on the Zoloft." (Id. at 000212).  Dr. Jones scheduled a brain CT scan in July 2002 and the results showed "atrophic changes of the brain without acute abnormality." (Id. at 000229).  Plaintiff returned on September 12, 2002 for a routine check-up.  Dr. Jones noted "patient states he is doing well subjectively; he is handling his work stress without any real difficulties now." (Id., at 000211).  Dr. Jones made no notation of any cognitive impairment and indicated plaintiff should continue current medication. (Id. at 000211).

at 000209).  On October 7, 2003, Dr. Jones noted as follows:

> The patient has been working at ARP for 25+ years.  He states he does several
> different jobs; he works down in the yard at times, at other times he is up 300 feet
> in the air on a crane.  Rodney Hancock, his supervisor, has talked with him about
> his work abilities, and some of the co-workers have discussed this with Mr.
> Hancock.  They do not feel that he is able physically to continue doing what he has
> been doing, and said that they would help him get work related disability if I
> agreed.  I certainly concur that he does not need to be doing any strenuous work or
> work at great heights and so forth.  I am writing a note to the effect that medical
> disability is recommended.

(Doc. 32, Exhibit A at 000208).  Dr. Jones did not report any cognitive impairment and did not

include depression or anxiety as a reason for recommending medical disability.  (Doc. 32, Exhibit

A at 000208).  On October 24, 2003, plaintiff returned to Dr. Jones with complaints of "persistent

left calcaneal [heel] bursitis" which had "bothered him for the approximately two months" (Doc.

32, Exhibit A at 000208).  Plaintiff's heel was injected with pain and anti-inflammatory

medication and he was given a prescription for medication to take for three days. (Doc. 32,

Exhibit A at 000208).  On December 5, 2003, plaintiff returned to Dr. Jones who noted plaintiff

was "doing well subjectively. Denies chest pain or dyspnea.  No GI or GU complaints. Still

looking at possible work related disability in January."  Dr. Jones did not report any cognitive

impairment, depression or anxiety. (Doc. 32, Exhibit A at 000206).  On December 21, 2003, on a

prescription pad, Dr. Jones wrote as follows:  "Mr. Pace is unable to work due to a medical

disability effective 1 /2 /04." (Doc. 32, Exhibit A at 000207).

 17. After plaintiff's date of disability, he returned to Dr. Stallworth on February 18, 2004

with complaints of hives but "[o]therwise, feeling well at this time." (Doc. 32, Exhibit A at

000206).  Dr. Stallworth prescribed medication and did not report any cognitive impairment,

depression or anxiety.  Plaintiff returned on March 24, 2004, reported no further rash problems

and "that he seems to be feeling fairly well otherwise." (Doc. 32, Exhibit A at 000205).  Dr. Stallworth did not report any cognitive impairment, depression or anxiety but did note that plaintiff should follow-up with a cardiologist as scheduled. (Doc. 32, Exhibit A at 000205).

18.  Dr. Stallworth referred plaintiff for a cardiac test, and on April 9, 2004, a stress test was performed at Northwest Florida Heart Group which showed some suspicion of ischemia. (Doc. 32, Exhibit A at 000139, 000204).  Dr. Stallworth referred plaintiff to a cardiologist, Daniel F. Phillips, M.D..  At the initial examination, on April 20, 2004, Charles Morgan, a nurse practitioner, noted plaintiff's report of his medical history, medications and family medical history.  Nurse Morgan also wrote as follows :

> Mr. Pace presents to the clinic today for evaluation by Dr. Phillips.  He did see Dr. Stallworth in March and had no changes made to his treatment regimen at that time.  Does state that his left foot has been bothering him a great deal, that he did retire January 2.  States that he has not been having any chest pain, palpitations, shortness of breath, orthopnea, edema, cramping or dizziness.  He does walk a mile a day with no symptoms.

(Doc. 32, Exhibit A at 000141, 000203).  Plaintiff did not report any mental or cognitive impairment, confusion, or memory loss and the nurse practitioner's records do not indicate that anyone other than plaintiff gave the report of past treatment, medications and family medical history.  Also, no anti-depressant medication was included in the list of plaintiff's medications. (Doc. 32, Exhibit A at 000141, 000203).  In the objective component of the evaluation, Nurse Morgan noted "[n]o acute distress noted. Alert and oriented to person, place and time.  Replies appropriately to questions posed." (Doc. 32, Exhibit A at 000141, 000203).  Nurse Morgan's assessment did not include depression, anxiety, or any cognitive impairment. (Doc. 32, Exhibit A at 000142-143, 000202).

19.  On April 21, 2004, Dr. Phillips performed a cardiac catheterization. (Doc. 32, Exhibit

-10-

A at 000198-202).  On discharge Dr. Phillips noted that there was "no intervention indicated.  The collateralization appears to be satisfactory." (Doc. 32, Exhibit A at 000202).  He also reported that plaintiff should continue his present medications which did not include an anti-depressant medication.  In regard to activity, Dr. Phillips stated that "no particular exertion restrictions are necessary." (Doc. 32, Exhibit A at 000202).  Dr. Phillips made no report of any cognitive impairment, depression or anxiety and noted that "Mr. Pace was stable and in good spirits as [he] was brought into the Cardiac Laboratory, and was positioned for a right femoral approach." (Doc. 32, Exhibit A at 000198).

     20.  Defendant acknowledged plaintiff's claim by correspondence dated May 27, 2004 wherein plaintiff was informed that his "policy has a 180 day waiting period, during which [he] must remain totally disabled, before benefits are payable." (Doc. 32, Exhibit A at 000181).  The letter also stated as follows:

> Since your disability occurred on January 7, 2004, this waiting period will be satisfied on July 4, 2004.  We will be using this time to obtain additional information to help us determine your eligibility for benefits.  Please complete and return the enclosed forms in the envelope provided for consideration of your claim.
>
> We have received medical documentation from both Dr. Dumont and Dr. Stallworth covering treatment through May 11, 2004.  We have not received medical documentation from your cardiologist.  Please contact all three physicians and request that copies of your medical records, office notes and test results be submitted to our office for your claim; date May 11, 2004 through the present from Doctors Dumont and Stallworth, and dated January 7, 2004, through present from your attending cardiologist.

(Doc. 32, Exhibit A at 000181).  The record indicates that plaintiff's doctors provided this documentation.[5]

---

[5] Defendant contacted plaintiff's physicians directly regarding updated records. (Doc. 32, Exhibit A at 000136, 000159)

21.   Plaintiff submitted a completed Activities Questionnaire dated June 2, 2004. (Doc. 32, Exhibit A at 000168-170).  Plaintiff wrote that he could sit for one hour at a time, stand for thirty minutes at a time, and walk one mile at a time, and that he sat five hours each day, stood three hours each day, and walked one hour each day.   He reported taking a half hour nap at 1:00 p.m. each day and that he spent nine hours in bed.  He also reported that he could sit in or drive a car for two hours.  He reported that he attended church and family get togethers and left the house twice during the week and once on week-ends.  He reported that he went outdoors "every day weather permitting" but "hardly ever" went shopping.  He reported he could do "some things" around the house, wash his car, and work in his garden. (Doc. 32, Exhibit A at 000168). He reported his wife performed all household chores but he would "sometimes" carry groceries into the house, but he was independent in personal grooming.  (Doc. 32, Exhibit A at 000169).

In response to the questionnaire's inquiry regarding experiences of "memory /concentration problems," plaintiff wrote: "When I go to do something I can't think to complete my task. I get confused I draw a blank.  I have trouble remembering things because of my nerves. I get upset and nervous on doing some things." (Doc. 32, Exhibit A at 000169).  In describing what prevented him from performing his own occupation, plaintiff wrote: "I can't think in order to perform my job.  I have trouble with my memory. I am not steady on my feet. I get clumsy." (Doc. 32, Exhibit A at 000170).  In regard to what prevented him from any gainful employment, he wrote: "I have trouble thinking what I am suppose [sic] to do next, at home my wife has to lay everything out step by step for me." (Doc. 32, Exhibit A at 000170).  Plaintiff described his daily routine as follows:

> I get up around six a.m.  Have coffee, eat breakfast, [watch] the news, walk a mile, watch t.v., then I go outside, sit on porch, listen to the radio. Go out in the yard,

work some in the garden.  Take a nap.  Go back outside do a little yard work.  Also do some chores for my wife.

(Doc. 32, Exhibit A at 000170).

22. On June 18, 2004, defendant sent a functional mental evaluation form to Dr. DuMont. He did not complete the form, but instead returned it stamped "See Documentation in Medical Records. (Doc. 32, Exhibit A at 000159-163, 000098-100).  The form called for assessments of plaintiff's general appearance, emotional status, sensorium, memory, cognition, judgment, insight, risk behaviors, substance abuse, and questions regarding such issues as how plaintiff's symptoms affect his ability to work, his residual functional ability, job tasks he could perform, and the type work he could perform. (Doc. 32, Exhibit A at 000159-163, 000098-100).

23.  On July 1, 2004, defendant's nurse case manager sent Dr. Stallworth a questionnaire to which he replied as follows:

> 1. We received medical office notes from Dr. Jones in 10/03, indicating Mr. Pace had problems with the physical demands at work. He did not provide an explanation or elaborate on Mr. Pace's physical impairment. Please provide an analysis of Mr. Pace's physical problems at that time.
>
> Coronary artery disease S/P MI, S/P CABG (1988) Hypertension, PUD, hyperlipidemia, pulmonary [illegible], anxiety/depression.
>
> 2. What changed in Mr. Pace's physical condition between 10/7/03 and 1/7/04 that prevented Mr. Pace from participating in work activities? Please provide any documentation to support this impaired status, which began on 1/7/04.
>
> Increased cognitive problems that were felt to [be] a danger to himself & others. Therefore, work was discontinued. Mr. Pace is being treated by Dr. DuMont, psychiatrist.
>
> 3. What restrictions and limitations have you placed on Mr. Pace's activities?
>
> Refer to # 2.  Limited walking due to [decreased] physical capabilities.  No strenuous work or work @ heights.

-13-

4. What is your current treatment plan?

Toprol XL 50 mg qd. Lipitor 10 mg qd. ASA ½ tab qd. Zoloft 50 qd  Avapro 100 mg qd. [illegible]  Routine followup 6 months prn.  Routine psychiatric followup per D. Dumont.

5. What is the cause of Mr. Pace's memory loss? What is the extent of this problem?

Felt to be due to multiple problems including aging, atherosclerotic disease, anxiety & depression.

(Doc. 32, Exhibit A at 000130-132).

24. On July 30, 2004, Steven Miszkiewicz, M. D., performed a peer review at the request

of defendant and provided a recommendation after review of plaintiff's medical records. (Doc.

32, Exhibit A at 000118-119).  Dr. Miszkiewicz's recommendations were

1. There is no medical evidence or documentation to support change in the claimant's status from 1/7/2004 to 7/5/2004.

2. While there is mention of coworkers questioning his ability to continue to do his job, his cardiologist has cleared him as late as 4/04.  His psychologist notes no cognitive deficits and his family practitioners do not document any change in his status over the last 12-18 months.

(Doc. 32, Exhibit A at 000118).  Dr. Miszkiewicz also found that

The claimant was placed on medical leave of absence without any documentation of impairment.  Subsequent cardiac catheterization documents no change in cardiac status and gives "no particular exertion restrictions."  As to cognitive impairment, the claimant was examined by Dr. Dumont on 3/31/04 and no cognitive impairment was documented.  In short, it appears that the claimant was placed on leave of absence based on a patient request but without documentation of change in the claimant's health status to substantiate this.

(Doc. 32, Exhibit A at 000118).  In regard to documentation, Dr. Miszkiewicz discussed the

medical records from Dr. Jones, Dr. Stallworth, Dr. Dumont and the cardiac test results. (Doc. 32,

Exhibit A at 000118-119).

25.  On August 9, 2004, defendant wrote plaintiff that it had denied his application.  (Doc. 32, Exhibit A at 000114-117).  In the letter, defendant explained the reasons for denial and  stated as follows:

> Based on our review of the information submitted in support of your claim, we have concluded that there is insufficient medical evidence to support an inability to perform all of the material and substantial duties of your Own Occupation. Therefore, we have determined that you have not met your Policy's definition of Disability, and must deny your claim for benefits.

(Doc. 32, Exhibit A at 000116).  The letter also explained the process for requesting review and stated that plaintiff should "include documentation such as any additional evidence which you feel will support your claim." (Doc. 32, Exhibit A at 000116).

26.  On August 23, 2004, plaintiff filed a request for reconsideration which was accompanied by a letter from Dr. DuMont. (Doc. 32, Exhibit A at 000087-88).[6]  Dr. DuMont stated as follows:

> I have reviewed your letter of August 9, 2004 to Mr. Pace and am in total disagreement as to his disability status.
>
> You ignored in my initial note of March 31, 2004 the statement that I advised Mr. Pace to "appeal social security denial as patient not capable of employment". This was based on my examination of the patient and my assessment of his capacity for vocational function which was and is impaired by his diagnoses of panic disorder and major depression. His well documented cognitive difficulties have not improved with treatment and in my medical opinion are consistent with a mild to moderate dementia additionally.
>
> When seen again at his scheduled follow-up appointment today his mental status is unchanged. He continues to report severe difficulties with memory and cognitive function. His spouse has to handle all business matters. She does all the driving other than just right around home due to his inability to stay focused and pay

---

[6] Apparently plaintiff also included a letter dated August 6, 2004, from his Social Security attorney which indicated that he had received a disability determination.  There is no information contained in the letter regarding the basis of the disability determination.

attention. He continues to have very poor stress tolerance with marked exacerbation of anxiety and depression if stressed.

It is my opinion that as a result of the above conditions that Mr. Pace was totally disabled for all gainful employment and vocational activity for a continuous period from December 19, 2003. He will not recover to return to vocational function.

(Doc. 32, Exhibit A at 000088).

27.  On August 30, 2004, defendant informed plaintiff that his request for reconsideration had been received and that the file was being forwarded to the appeals unit. (Doc. 32, Exhibit A at 000086).

28.  The Appeal Review Consultant sent plaintiff's records for an independent psychiatric peer review and on September 29, 2004, Thomas G. Gratzer, M.D., a psychiatrist, neurologist and forensic psychiatrist, provided a report after review of plaintiff's medical records. (Doc. 32, Exhibit A at  000085).[7]  Dr. Gratzer reported that plaintiff's diagnoses were major depression and panic disorder which were controlled by medication. (Doc. 32, Exhibit A at 000079).  Following a six-page summary of plaintiff's records, Dr. Gratzer concluded as follows:

Mr. Pace has been on medical retirement since 1/02/2004. The medical retirement was initially supported by his family doctor, Dr. Jones. Now it seems to be also supported by his psychiatrist, Dr. Dumont, whom he has seen since 3/31/2004. Dr. Dumont has referred to a diagnosis of Panic Disorder/Major Depression. Overall, Dr. Dumont has indicated that he believes that Mr. Pace is psychiatrically impaired on the basis of cognitive difficulties.

The treatment records do not document cognitive limitations consistent with psychiatric impairment. Treatment records from Dr. Dumont also do not document cognitive limitations consistent with psychiatric or medical impairment. The treatment records do indicate that Mr. Pace wanted to go on medical retirement and was urged to do so by his coworkers in late 2003. Medical records do not document functional limitations consistent with psychiatric impairment.

---

[7]Dr. Gratzer attempted to contact Dr. Dumont through a scheduled phone consult on September 28th and 29th, 2004.  However, contact Dr. Dumont was not successful.  (Doc. 32, Exhibit A at 000079).

(Doc. 32, Exhibit A at 000079).   In response to questions provided on appeal, Dr. Gratzer responded that the psychiatric diagnosis was "major depression in partial to fill (*sic*) remission and a history of panic disorder" which were well-controlled by medication. (Doc. 32, Exhibit A at 000079).  Dr. Gratzer also stated that plaintiff's symptoms of depression and panic disorder appeared to have been resolved by treatment during the Elimination Period. (Doc. 32, Exhibit A at 000080).   In regard to plaintiff's depression, Dr. Gratzer found no documentation of clinical signs and symptoms such as "acutely depressed mood for greater than two weeks or associated neurovegetative symptoms of depression such as impaired energy, impaired interest, impaired sleep, and impaired appetite." (Doc. 32, Exhibit A at 000080).  In regard to plaintiff's cognitive impairment, Dr. Gratzer advised:

> The treatment records from Dr. Stahlworth and his family doctor do not document evidence of cognitive limitations. Although Dr. Dumont refers to significant cognitive limitations as the basis of Mr. Pace's disability, his treatment records do not document functional limitations or associated difficulties related to cognitive limitations or impairment.
> …
> In my review of the records, I do not find evidence of functional limitations and restrictions relative to Mr. Pace's psychiatric condition and specifically relative to Mr. Pace's cognitive functioning.

(Doc. 32, Exhibit A at 000079).  Dr. Gratzer concluded that in his opinion,

> the treatment records do not document continuously significant psychiatric impairment from 1/07/2004 through 7/05/2004.  Treatment records indicate that Mr. Pace has depressive and anxiety symptoms that are well controlled during this period of time.  The treatment records do not document cognitive limitations.  In my opinion, the treatment records do not document significant psychiatric impairment between the periods of time referenced above.

(Doc. 32, Exhibit A at 000081).

29.  On September 30, 2004, based upon Dr. Gratzer's findings, defendant wrote plaintiff to inform him that his request for reconsideration had been denied. (Doc. 32, Exhibit A at

000068-72).


## CONCLUSIONS OF LAW

**I.  Summary Judgment Standard**

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A district court should grant summary judgment when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." See Nolen v. Boca Raton Cmty. Hosp., Inc., 373 F.3d 1151, 1154 (11th Cir.2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).We resolve all issues of material fact in favor of the plaintiff, and then determine the legal question of whether the defendant is entitled to judgment as a matter of law under that version of the facts. Durruthy v. Pastor, 351 F.3d 1080, 1084 (11th Cir.2003).  If the evidence could not lead a rational fact-finder to find for the nonmoving party, and where the nonmoving party fails to make a sufficient showing to demonstrate an element essential to that party's case, on which that party bears the burden of proof at trial, then no genuine of issue material fact exists, and summary judgment should be granted. Celotex, 477 U.S. at 322-23, 106 S.Ct. 2548; see Holbrook v. City of Alpharetta, 112 F.3d 1522, 1525-26 (11th Cir.1997). Finally, genuine disputes are "those in which the evidence is such that a reasonable [fact-finder] could return a verdict for the non-movant. For factual issues to be considered genuine, they must have a real basis in the record." Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir.1996).

**II.     Standard of Review under ERISA**

It is undisputed that the group disability insurance policy issued by defendant to Alabama River Pulp Company is governed by ERISA and that plaintiff was denied benefits under the policy.  Therefore, the court must first determine the proper standard of review for denial of benefits under the statute.   The Eleventh Circuit has set forth three standards of review that a court may apply in reviewing a plan administrator's claims decisions: "(1) de novo where the plan does not grant the administrator discretion [i.e., does not exercise discretion in deciding claims;] (2) arbitrary and capricious [where] the plan grants the administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan grants the administrator such discretion but] ··· [he has] ··· a conflict of interest." Williams v. BellSouth Telecommunications, Inc., 373 F. 3d 1132, 1135 (11th Cir. 2004) (footnote omitted) citing Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 109, 109 S. Ct. 948 (1989); HCA Health Servs. of Georgia., Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir.2001) (quoting Buckley v. Metro. Life, 115 F.3d 936, 939 (11th Cir.1997)). [8]

Also, in Williams the Eleventh Circuit, finding that the "distinctions between the heightened arbitrary and capricious, arbitrary and capricious, and de novo standards of review" had become "difficult to discern over time", 373 F. 3d at 1137, set forth the following clarification:

> De novo review, which we employ in reviewing "no-discretion" plan decisions, offers the highest scrutiny (and thus the least judicial deference) to the administrator's decision. In fact, we accord no deference there, since, no judgment/discretion was exercised in making the determination ( i.e., there is no discretion to which we would defer).
>
> In contrast, where the administrator has discretion ( i.e., applies his own judgment)

---

[8] "Courts, however, read Firestone broadly, applying its three levels of review to both plan interpretations and factual determinations." Williams, 373 F. 3d at 1134 n.3.

in making plan decisions, we review under the arbitrary and capricious standard (which is substantively the same as the "abuse of discretion" standard, Shaw [v. Connecticut Gen. Life Ins. Co., 353 F.3d 1276, 1284-85 n. 6 (11th Cir. 2003)]. We use it to avoid judicial second guessing/intrusion by according the most judicial deference (and thus, the least judicial scrutiny).

Finally, where the administrator has discretion but exercises it under a conflict of interest, we apply "heightened arbitrary and capricious" review. There we apply a level of deference (and conversely, scrutiny) somewhere between what is applied under the de novo and "regular" arbitrary and capricious standards.

In HCA, we incorporated these varying levels of judicial review in a multi-step approach. For clarity, we recapitulate that approach (240 F.3d at 993-95) in a simpler version here, for use in judicially reviewing virtually all ERISA-plan benefit denials [both benefits denials based on plan interpretations as well on factual determination]: (Footnote 6 omitted)

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" ( i.e., the court disagrees with the administrator's decision); [See HCA, 240 F.3d at 993 n. 23.], if it is not, then end the inquiry and affirm the decision.

> (2) If the administrator's decision in fact is "de novo wrong," (Footnote 8 omitted) then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

> (3) If the administrator's decision is " de novo wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds (footnote 9 omitted) supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

> (5) If there is no conflict, then end the inquiry and affirm the decision.

> (6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

We described "heightened arbitrary and capricious review" *supra* as somewhere

between the de novo and "mere" arbitrary and capricious standards. But where is that "somewhere"? Supreme Court decisions have not explained it. See Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377, 390-94 (3rd Cir.2000). "[C]ircuit courts agree that a conflict of interest triggers a less deferential standard of review ⋯ [but] ⋯⋯ differ over how this lesser degree of deference alters their review process." Chambers v. Family Health Plan Corp., 100 F.3d 818, 825 (10th Cir.1996).

Our circuit, at least in plan interpretation cases (unlike this, a factual determination case),  has incorporated a two step, burden-shifting, approach:

> (1) The claimant shows that the administrator of a discretion-vesting plan is conflicted.

> (2) The administrator then proves that his plan interpretation was not tainted by self-interest.

See Brown [v. Blue Cross and Blue Shield of Alabama, Inc., 898 F.2d 1556, 1566 (11th Cir. 1990) cert. denied, 498 U.S. 1040, 111 S.Ct. 712 (1991).]

A wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the administrator at the expense of the claimant. Id. at 1566-67. But, if the administrator can demonstrate a routine practice or give other plausible justifications-such as benefitting the interests of other beneficiaries-judicial deference to it may be granted, since "[e]ven a conflicted [administrator] should receive deference when [he] demonstrates that [he] is exercising discretion among choices which reasonably may be considered to be in the interests of the participants and beneficiaries." Id. at 1568.

Williams, 373 F. 3d at 1137-1139.

In the present case, the parties do not dispute that the policy gave defendant "sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder." (Doc. 32, Exhibit A at 000030).  Because there is an express grant of authority, the standard of review is not de novo, Williams, 373 F. 3d at 1137, so the court next looks to which arbitrary and capricious standard applies. Id.; see also HCA, 240 F.3d at 992 (citation omitted).  The parties do not dispute that defendant also pays the disability benefits when a claim is accepted.  Therefore, a conflict of interest may arise between the "fiduciary and profit-making interest" which triggers

the "heightened" arbitrary and capricious review. Williams, 373 F.3d at 1137, citing Brown, 898

F.2d at 1562 (noting that heightened standard "must be contextually tailored" to case); see also

Levinson v. Reliance Standard Life Ins. Co., 245 F.3d 1321, 1325-26 (11th Cir. 2001) (applying

heightened arbitrary and capricious review where the employer both funded and administered the

plan which created a conflict of interest between its fiduciary and profit-making interests).  Also,

if there is a conflict of interest and the proper tier of review is the heightened arbitrary and

capricious standard, then the burden-shifting provisions of Brown must be applied. Torres v.

Pittston Company, 346 F. 3d. 1324, 1332 (11th Cir. 2003).

However, when the heightened arbitrary and capricious standard applies, the court begins

the review process by evaluating the claims administrator's decision to determine whether it was

"wrong" from the perspective of a de novo review.  "It is fundamental that the fiduciary's

interpretation first must be 'wrong' from the perspective of de novo review before a reviewing

court is concerned with the self-interest of the fiduciary." Brown v. Blue Cross & Blue Shield of

Ala., Inc., 898 F.2d 1556, 1566 n.12 (11th Cir. 1990); Williams, 373 F. 3d at 1138.   As previously

stated, de novo review, "offers the highest scrutiny (and thus the least judicial deference) to the

administrator's decision." Williams, 373 F. 3d at 1135.  An administrator's benefits denial

decision is "wrong" if "the court disagrees with the administrator's decision." Richards v

Hartford Life & Accident Insurance Company, 153 Fed. Appx 694 (11th Cir. 2005) (unpublished

opinion); HCA, 240 F.3d at 993 n.23.[9]

---

[9]The court in Williams does not address whether the first step de novo review required by
Williams in a heightened arbitrary and capricious case, is a review that allows for evidence
outside of the administrative record to be submitted to refute the factual determinations made by
the administrator.  However, it appears that question is resolved in Richards v. Hartford Life &
Accident Insurance Company, 153 Fed. Appx. 694 (11th Cir. 2005).  Richards involved a denial
that was subject to the heightened arbitrary and capricious standard of review.  In applying the

**III.    Defendant's Motion for Summary Judgment**

Defendant argues that there is no genuine dispute of material fact such that the court could find that its determination was de novo wrong or not reasonable and an abuse of discretion under the heightened arbitrary and capricious standard of review.  Defendant argues that the absence of objective evidence such as clinical test results and documentation in the medical records to support plaintiff's allegations of a disabling mental or physical impairment, constitutes substantial evidence to support its determination that plaintiff failed to demonstrate a continuing  disability throughout the six month elimination period.  Defendant argues that it reasonably based its decision to deny plaintiff's claim upon the opinions of Dr. Miszkiewicz and Dr. Gratzer, who performed peer reviews of plaintiff's administrative records including the medical records from Dr. DuMont, Dr. Jones and Dr. Stallworth,[10] and found that there was not sufficient documentation to support a change in plaintiff's status during the six month elimination period.  Additionally, defendant argues that treating physicians have no preference in ERISA as they may in other areas of law and thus it reasonably relied upon the peer review physicians.  (Doc. 29).

Plaintiff responds that a genuine issue of a material fact exists because the evidence offered in opposition to the motion for summary judgment, the sworn statement of Dr. DuMont, creates a material question of fact on the issue of whether the defendant's "technique or mode of analysis" in handling plaintiff's claim was fair and reasonable.  Specifically, plaintiff argues that

first step de novo review articulated in Williams, the court specifically stated that the de novo review is of the administrative record and that it was not error for the district court to refuse to consider affidavits that were not part of the administrative record.  Richards at 696.

[10] Defendant argues that Dr. DuMont's treatment records, the treatment notes of Dr. Jones from October 2003 (Doc. 32, Exhibit A at 000208), and the conflicting responses of Dr. Stallworth to the nurse case manager's questionnaire (Doc. 32, Exhibit A at 000130-132), support its decision.

the sworn statement of Dr. DuMont establishes that the peer review opinions are medically

unreliable and unreasonable because the psychiatrists never examined the plaintiff and thus, the

plan administrator relied upon medically unreliable and unreasonable evidence.  Plaintiff also

argues that Dr. DuMont's statement establishes that defendant misstated the content of Dr.

DuMont's records because his treatment notes do contain documentation of objective clinical

signs which document plaintiff's cognitive impairment.  Thus, plaintiff argues that a genuine

issue of material fact exists as to whether there was documentation in plaintiff's treatment records

to support a finding that he was disabled during the six month elimination period.[11] (Doc. 34)

     Defendant replies that plaintiff relies solely upon the unadmissible sworn statement of Dr.

DuMont to establish a genuine issue of material fact and thus has failed to provide the court with

any evidence to rebut defendant's argument.  Defendant also argues that it was not required to

---

[11]   The only response not based upon Dr. DuMont's sworn statement was that defendant
did not identify what objective clinical or diagnostic tests should have been administered to
quantify or document the extent of plaintiff's disability and that defendant did not have the right
to ignore the findings of Dr. DuMont who was the only psychiatrist to examine plaintiff. (Doc.
34 p. 11-12).  Plaintiff does not support these conclusory statements with case law or argument.
In its reply defendant provides a list of various psychiatric tests which have been used in other
cases to identify, quantify, and diagnose mental impairments. (Doc. 35).  Importantly, since
plaintiff bears the burden of proof, obtaining that proof through objective, diagnostic tests is his
responsibility.  Moreover, the policy states that proof means ". . . 3. the provision by the
attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays, and/or
other forms of objective medical evidence in support of a claim for benefits." (Doc. 32, Exhibit
A at 000009).  The policy also states that "[p]roof must be submitted in a form or format
satisfactory to Liberty." (Id.).  Also, in its reply defendant states that it did not ignore Dr.
DuMont but instead discredited his finding based on other medical evidence in the record.  In
Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S.Ct. 1965, 1972 (U.S. 2003)
the Supreme Court held that a treating physician did not accord special weight stating that
"[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable
evidence, including the opinions of a treating physician.  But, we hold, courts have no warrant to
require administrators automatically to accord special weight to the opinions of a claimant's
physician; nor may courts impose on plan administrators a discrete burden of explanation when
they credit reliable evidence that conflicts with a treating physician's evaluation. (Footnote
omitted)."

identify the objective quantifying medical tests or type of documentation which Dr. DuMont

should have used to establish plaintiff's cognitive impairment and that this court may take judicial

notice of the many medical signs and psychological and psychiatric tests employed by

psychiatrists in other cases to establish the level or existence of cognitive impairment.  (Doc. 35).

In the present case there is no dispute that defendant had discretion to determine

eligibility, funded the plan, and administered the plan. Thus, the heightened arbitrary and

capricious standard applies if after first applying a de novo review of the administrative record

this court finds that the  "claim administrator's decision is 'wrong' (i.e., the court disagrees with

the administrator's decision)." Richards, 153 Fed. Appx. 694, 696-697 (11th Cir. 2005) quoting

Williams, 373 F. 3d 1138.

As an initial consideration, plaintiff offers the sworn statement obtained in June 2005 of

Dr. DuMont as evidence to support his argument that a genuine issue of material fact exists in this

case.  Plaintiff argues that the sworn statement is offered to show that defendant's "technique or

mode or analysis" is flawed because defendant relied upon medically unreliable conclusions (the

opinions of two psychiatrists who reviewed medical records but did not examine plaintiff) and

misstated facts (their opinion that plaintiff's medical records did not document functional

limitations resulting from his alleged mental impairment).  Plaintiff relies upon Shipp v.

Provident Life & Accident Ins. Co., 214 F. Supp. 2d 1241 (M.D. Ala. 2002) to support his

argument that such evidence is admissible.

This court previously upheld on appeal a decision of U.S. Magistrate Judge William E.

Cassady wherein he denied plaintiff's motion to expand discovery to include this same sworn

statement. (Docs. 21-25, 33, 39).  Additionally, after Judge Cassady's decision was entered on

July 19, 2005, the Eleventh Circuit in November 2005, addressed a district court's refusal to consider affidavits of a doctor and the plaintiff executed more than eleven months after the final administrative decision.  The Circuit Court found that the affidavits should not be considered by the district court because, "although plaintiff argues that the affidavits recited information known to Hartford, the affidavits were prepared while defendant's summary judgment motion was pending and are no part of the administrative record." Richards, 153 Fed. Appx. 697 n.1.   In this case the June 2005 sworn statement of Dr. Dumont was obtained eight months after the final denial of the claim and were prepared for the litigation of this case.   Accordingly, the court will not consider plaintiff's response to the extent that it is based upon inadmissible evidence, Dr. DuMont's sworn statement.

Under ERISA, plaintiff must prove he is entitled to benefits.  Horton v. Reliance Standard Life Ins., Co., 141 F. 3d 1038, 1040 (11th Cir. 1998).  To do so, plaintiff must produce medical records which support his claim of disability and that the disability persists during the six month elimination period.  The policy states that "disability" or "disabled" for a person subject to the 24 month "own occupation" benefit, "means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation".  In the letter of denial dated August 9, 2004, defendant explained the reasons as follows:

> Based on our review of the information submitted in support of your claim, we have concluded that there is insufficient medical evidence to support an inability to perform all of the material and substantial duties of your Own Occupation. Therefore, we have determined that you have not met your Policy's definition of Disability, and must deny your claim for benefits.

(Doc. 32, Exhibit A at 000116).

Upon review of the administrative and medical record in a light most favorable to the plaintiff, the court finds that no genuine issue of material fact exists in regard to whether the decision of the administrator was supported by reasonable grounds.

Plaintiff saw Dr. DuMont on four occasions, the first on March 31, 2004[12], almost three months after his alleged onset of mental disability.  However, as recent as February 18, 2004, he was seen by Dr. Stallworth with complaints of hives but Dr. Stallworth noted plaintiff was "[o]therwise, feeling well at this time." (Doc. 32, Exhibit A at 000206).  Dr. Stallworth did not document any report of cognitive impairment, depression or anxiety and did not document his own objective observation of these impairments.  Plaintiff returned on March 24, 2004, approximately a week before he first saw Dr. DuMont.  He reported no further rash problems and Dr. Stallworth noted that plaintiff "seems to be feeling fairly well otherwise." (Doc. 32, Exhibit A at 000205).  Again, Dr. Stallworth did not report or document any cognitive impairment, memory

_____

[12]  On March 31, 2004, at the initial visit, Dr. DuMont noted as follows:

> Referred for eval by Dr. Stallworth of Monroeville for eval of depression & anxiety. He was medically retired from the mill where he worked for 25 yrs in maintenance.  Had CABG [coronary artery bypass graft] 16 yr ago & cont to be followed regularly.  Had by description a panic attack in 1998 when he pulled off the road & found in confused state.  Had neg med eval & was started on Zoloft with good benefit but symptoms returned every time he got off of it. Even on it he remained anxious, fearful, intolerant of others, confused, shaky, tremulous with problems retaining or learning new information. Can't remember names. Spouse has to handle all bills, etc. Advise appeal Soc Sec Denial as pt not capable of employment.

(Doc. 32, Exhibit A at 000097).  The notes consist of Dr. DuMont's recording of plaintiff's subjective complaints.  On mental status examination, Dr. Dumont noted his impression that plaintiff was "alert/ O x 4", grooming is "good", mood "anxious", spontaneity "fair", psychomotor activity [normal], speech "fluent", thought processes "cogent", hallucinations/ delusion and suicidal ideations "none", judgment "good", and insight "good". (Doc. 32, Exhibit A at 000097).  Dr. DuMont did not report the results of a mental status examination at the next three visits. (Doc. 32, Exhibit A at 000094-97).

loss, depression or anxiety but did note that plaintiff should follow-up with a cardiologist as scheduled. (Doc. 32, Exhibit A at 000205).

In April 2004, plaintiff was seen by Dr. Phillips, a cardiologist.  Dr. Phillips' treatment records do not indicate any observation by Dr. Phillips that plaintiff had cognitive impairment, memory loss, depression or anxiety.  On April 20, 2004, Charles Morgan, a nurse practitioner with Dr. Phillips, noted plaintiff's report of his medical history, medications and family medical history.  Plaintiff did not report any mental or cognitive impairment, confusion, or memory loss and in the objective component of the evaluation, Nurse Morgan noted "[n]o acute distress noted. Alert and oriented to person, place and time.  Replies appropriately to questions posed." (Doc. 32, Exhibit A at 000141, 000203).  Nurse Morgan also wrote as follows:

> Mr. Pace presents to the clinic today for evaluation by Dr. Phillips.  He did see Dr. Stallworth in March and had no changes made to his treatment regimen at that time.  Does state that his left foot has been bothering him a great deal, that he did retire January 2.  States that he has not been having any chest pain, palpitations, shortness of breath, orthopnea, edema, cramping or dizziness.  He does walk a mile a day with no symptoms.

(Doc. 32, Exhibit A at 000141, 000203).   On April 21, 2004, Dr. Phillips performed a cardiac catheterization.  At discharge, he indicated plaintiff should continue his present medication which did not include an anti-depressant medication and did not report or document any cognitive impairment, memory loss, depression or anxiety.  Instead, before the catheterization, he noted that "Mr. Pace was stable and in good spirits as [he] was brought into the Cardiac Laboratory, and was positioned for a right femoral approach." (Doc. 32, Exhibit A at 000198).   Also, even though plaintiff reports to Dr. DuMont that his wife "handles all bills, etc," and she appears to have accompanied him to his psychiatric visits, none of the treatment records from Dr. Stallworth or Dr. Phillips which are contemporaneous with Dr. Dumont's treatment, indicate that anyone other

than plaintiff reported his status to the doctors or conferred with the doctors regarding his medical care.

But for Dr. DuMont's opinion of cognitive impairment and dementia in 2004, his report of plaintiff's subjective complaints, and Dr. DuMont's one mental status examination on March 31, 2004, there are scant other records which mention any objective observation which could indicate cognitive impairment.  In June 2002, Dr. Jones noted "intermittent memory impairment/confusion" following plaintiff's attempt to "taper off" taking Zoloft.  (Doc. 32, Exhibit A at 000212).  However, when plaintiff returned on September 12, 2002 for his routine check-up, Dr. Jones noted "patient states he is doing well subjectively; he is handling his work stress without any real difficulties now." (Id., at 000211).  Dr. Jones did not note any cognitive impairment and indicated plaintiff should continue his current medication. (Id. at 000211).  Dr. Jones did not document any cognitive impairment, depression or anxiety between September 2002 and December 2003 when he advised that plaintiff was medically unable to work.  (Doc. 32, Exhibit A at 000206-211).  Plaintiff worked until January 6, 2004 and was not treated by Dr. Dumont until March 31, 2004.

As both of the peer review physicians noted, the first mention of "disability" in the claim file occurred in Dr. Jones' treatment records of October 7, 2003.  Dr. Jones did not specify what impairment resulted in the medical disability but appears to have limited it to physical ability.  He wrote as follows:

> The patient has been working at ARP for 25+ years. He states that he does several different jobs; he works down in the yard at times, at other times he is up 300 feet in the air on a crane. Rodney Hancock, his supervisor, has talked with him about his work abilities, and some of the co-workers have discussed this with Mr. Hancock. They do not feel that he is able physically to continue doing what he has been doing, and said that they would help him get work related disability if I

-29-

agreed.

I certainly concur that he does not need to be doing any strenuous work or work at great heights and so forth. I am writing a note to the effect that medical disability is recommended.

(Doc. 32, Exhibit A at 000208).  Before that date, physical disability had not been mentioned in

Dr. Jones' records or in the records of Dr. Stallworth, his associate.  On December 21, 2003, on a

prescription pad, Dr. Jones wrote as follows:  "Mr. Pace is unable to work due to a medical

disability effective 1 /2 /04." (Doc. 32, Exhibit A at 000207).  There does not appear to be any

reference to a specific physical impairment underlying the medical disability, except that plaintiff

was being treated for bursitis in his left heel.  As noted by Dr. Miszkiewicz, after the cardiac

catheterization in April 2004, Dr. Phillips, the cardiologist discharged plaintiff without exertional

restriction. (Doc. 32, Exhibit A at 000118).

Defendant relied upon the findings of Dr. Miszkiewicz and Dr. Gratzer to reach its

decision.  Dr. Gratzer reviewed plaintiff's medical records and produced a detailed six page

report wherein he concluded as follows:

Mr. Pace has been on medical retirement since 1/02/2004. The medical retirement was initially supported by his family doctor, Dr. Jones. Now it seems to be also supported by his psychiatrist, Dr. Dumont, whom he has seen since 3/31/2004. Dr. Dumont has referred to a diagnosis of Panic Disorder/Major Depression. Overall, Dr. Dumont has indicated that he believes that Mr. Pace is psychiatrically impaired on the basis of cognitive difficulties.

The treatment records do not document cognitive limitations consistent with psychiatric impairment.  Treatment records from Dr. Dumont also do not document cognitive limitations consistent with psychiatric or medical impairment. The treatment records do indicate that Mr. Pace wanted to go on medical retirement and was urged to do so by his coworkers in late 2003.  Medical records do not document functional limitations consistent with psychiatric impairment.

(Doc. 32, Exhibit A at 000079).  In response to questions provided on appeal, Dr. Gratzer

-30-

responded that the psychiatric diagnosis was "major depression in partial to fill (*sic*) remission

and a history of panic disorder" which were well-controlled by medication. (Doc. 32, Exhibit A at

000079).  Dr. Gratzer also stated that plaintiff's symptoms of depression and panic disorder

appeared to have been resolved by treatment during the Elimination Period. (Doc. 32, Exhibit A

at 000080).  In regard to plaintiff's depression, Dr. Gratzer found no documentation of clinical

signs and symptoms such as "acutely depressed mood for greater that two weeks or associated

neurovegetative symptoms of depression such as impaired energy, impaired interest, impaired

sleep, and impaired appetite." (Doc. 32, Exhibit A at 000080).  In regard to plaintiff's cognitive

impairment, Dr. Gratzer advised:

> The treatment records from Dr. Stahlworth and his family doctor do not document
> evidence of cognitive limitations. Although Dr. Dumont refers to significant
> cognitive limitations as the basis of Mr. Pace's disability, his treatment records do
> not document functional limitations or associated difficulties related to cognitive
> limitations or impairment.
> …
> In my review of the records, I do not find evidence of functional limitations and
> restrictions relative to Mr. Pace's psychiatric condition and specifically relative to
> Mr. Pace's cognitive functioning.

(Doc. 32, Exhibit A at 000079).  Dr. Gratzer concluded that in his opinion,

> the treatment records do not document continuously significant psychiatric
> impairment from 1/07/2004 through 7/05/2004.  Treatment records indicate that
> Mr. Pace has depressive and anxiety symptoms that are well controlled during this
> period of time.  The treatment records do not document cognitive limitations.  In
> my opinion, the treatment records do not document significant psychiatric
> impairment between the periods of time referenced above.

(Doc. 32, Exhibit A at 000081).

      Upon de novo review of the medical and administrative record submitted to defendant, the

court cannot say that defendant's determination that plaintiff was not entitled to benefits because

he did not provide documentation of a physical or mental impairment consistently during the six

month elimination period was wrong.  The records from Dr. Dumont provide no significant objective findings regarding plaintiff's mental impairment.  Rather Dr. Dumont's records primarily document plaintiff's subjective complaints.  See McGee v. Reliance Ste. Life Ins. Co., 360 F.3d 921, 925 (8th Cir. 2004)("It is not unreasonable for a plan administrator to deny benefits based upon a lack of objective evidence.")  Moreover, despite plaintiff's argument to the contrary, the two experts relied upon by the defendant did not attempt to diagnose the plaintiff but rather they conducted a peer review to determine whether the medical evidence supported a disability finding.  It was not unreasonable nor wrong for the defendants to rely on these experts for the purpose of finding that the treating physicians' records did not objectively support a disability finding. "Nothing in [ERISA] suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does [ERISA] impose a heightened burden of explanation on administrators when they reject a treating physicians' opinion." Black & Decker, 538 U.S. at 831.  Accordingly, because the decision is not "wrong", the court ends its inquiry here, and need not proceed to the heightened arbitrary and capricious standard.

## CONCLUSION

Based on the foregoing, it is the opinion of the undersigned that the defendant's decision to deny plaintiff benefits under the Liberty Life Policy **was not** a de novo wrong decision, thus no genuine issue of material fact exists as to whether the denial was based on reasonable grounds. Accordingly, defendant's motion for summary judgment under Fed.R.Civ.P. 56(c) as to all claims

is **GRANTED.**[13]

      **DONE** this the 3rd day of February, 2006.

                                  **s/ Kristi K. DuBose**
                                  **KRISTI K. DuBOSE**
                                  **UNITED STATES DISTRICT JUDGE**

---

[13] Defendant seeks to recover costs and attorney fees relative to this litigation. The district court has discretion "to allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g). Also, "the law provides no presumption in favor of granting attorney's fees to a prevailing claimant in ERISA action." Freeman v. Continental Ins. Co., 996 F.2d 1116, 1121 (11th Cir.1993). In Wright v. Hanna Steel Corp., 270 F.3d 1336 (11th Cir. 2001), the Eleventh Circuit identified the following factors to consider in exercising discretion to award or deny attorney's fees:

    (1) the degree of the opposing part[y's] culpability or bad faith;

    (2) the ability of the opposing part[y] to satisfy an award of attorney's fees;

    (3) whether an award of attorney's fees against the opposing part[y] would deter other persons acting under similar circumstances;

    (4) whether the part[y] requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; [and]

    (5) the relative merits of the parties' positions.

Id. at 1344-1345 (citations omitted). The Circuit Court also stated that "no one of these factors is necessarily decisive, and some may not be apropos in a given case, but together they are the nuclei of concerns that a court should address.... In particular types of cases, or in any individual case, however, other considerations may be relevant as well." Id. at 1345 (citations omitted).

    The defendant presented a one-sentence, unsupported request for an award of costs and attorney's fees in its motion for summary judgment and reply. The plaintiff did not address defendant's request in its response. However, applying these factors to the facts and circumstances of this case, the court finds that an award of costs and attorney's fees is not warranted in this action. Specifically, there has been no showing of bad faith on plaintiff's part nor has there been any showing that plaintiff is in a position to pay attorney fees. Moreover, although the plaintiff lost, his position was not totally without merit. Accordingly, defendant's claim for costs and attorney's fees is **DENIED.**